527 So.2d 1052 (1988)
AMERICAN BANK & TRUST COMPANY
v.
SHEL-BOZE, INC., et al.
No. CA 87 0674.
Court of Appeal of Louisiana, First Circuit.
June 21, 1988.
William Shockey, Baton Rouge, for plaintiff-appellant American Bank & Trust Co.
Dee Taylor, Baton Rouge, for defendant-appellee Shel-Boze, Inc.
*1053 Craig Kaster, Baton Rouge, for defendant-appellee Jenkins Tile Co.
Donnie Floyd, Baton Rouge, for defendant-appellee Dayton Heating & Air Conditioning, Inc.
Before COVINGTON, C.J., and SAVOIE and LeBLANC, JJ.
COVINGTON, Chief Judge.
This is a devolutive appeal by plaintiff, American Bank & Trust Company, from a judgment in favor of defendants, Jenkins Tile Company, Inc., Shel-Boze, Inc., William J. Jenkins and Hugh A. Shelton, dismissing plaintiff's action at its costs.
Appellant, American Bank & Trust Company, (hereinafter referred to as "AmBank") is the holder of a number of promissory notes executed by A & M Builders, Inc. (A & M) and secured by collateral mortgages affecting two residential lots in Riverbend Subdivision, Fourth Filing, East Baton Rouge Parish, Louisiana. Financing was provided to A & M by AmBank for the construction of a single-family dwelling on each of the lots. In the course of the construction of these residences, A & M, contracted with appellees, Shel-Boze, Inc. (Shel-Boze) and Jenkins Tile Company, Inc. (Jenkins Tile) respectively, for the purchase of and installation of light fixtures and related electrical paraphernalia, and carpeting. All of these items were installed in the residences constructed by A & M.
On November 10, 1985, after each of the residences had been substantially completed, A & M surrendered physical possession of the two residences in question to AmBank, because A & M was unable to meet its financial obligation to AmBank. A letter of surrender from the principal of A & M is in evidence. After the residences were substantially completed and ready for occupancy, and after AmBank had advanced funds to the owner to pay for the materials purchased from the defendants, representatives of Shel-Boze and Jenkins Tile went to the two residences and removed all of the items which had been sold and/or installed by them with the permission of A & M. Neither Shel-Boze nor Jenkins Tile received payment from A & M for the materials they supplied. Additionally, Jenkins Tile was not paid its installation charges.
A petition for foreclosure was filed by AmBank on November 22, 1985, in the 19th Judicial District Court. The record of that proceeding was introduced at trial as evidence. Pursuant to orders of the court, the subject lots and residences were seized and sold at sheriff's sale. By sheriff's deed recorded on July 22, 1986, the subject residences were purchased by AmBank. As shown at trial by the testimony of representatives of Stuart Distributors and Lacour's Carpet World, AmBank purchased light fixtures and related electrical paraphernalia and carpeting for the subject residences to replace those previously removed by Shel-Boze and Jenkins Tile. The cost of purchasing and installing these replacement items was introduced at trial.
AmBank filed suit against the corporate defendants, Shel-Boze and Jenkins Tile, and the individual defendants, Hugh Shelton and William Jenkins, asserting that the light fixtures and related electrical paraphernalia and the carpet all had became component parts of each of the respective residences upon installation, and each of these items thus became encumbered with the mortgages in favor of AmBank. The acts of defendants in removing the items from the residences allegedly caused substantial damage to the immovables at that time possessed by AmBank, and subject to their mortgages. (Originally, Dayton Heating and Air Conditioning, Inc. and Donald Levatino were also joined as party defendants, but AmBank settled its claims against them prior to trial.)
AmBank claims that defendants are liable for the value of the various items removed by them from the two residences, together with the costs of reinstallation of said items.
The case was tried by bench trial on February 9, 1987. After trial, judgment was rendered in favor of the defendants, with the trial judge assigning oral reasons for judgment. It is that judgment by the trial court signed February 12, 1987, dismissing *1054 AmBank's demands against Shel-Boze, Jenkins Tile, Shelton and Jenkins which AmBank appeals.
This case presents questions of law, rather than questions of fact. No conflicting testimony was presented at trial on the merits for the trial judge to resolve.
We find that the trial judge erred in his conclusion that the light fixtures and other electrical paraphernalia removed by Shel-Boze, and the carpeting removed by Jenkins Tile had not become component parts of the residences.
Applicable law can be found in Louisiana Civil Code Article 466, which provides as follows:
Things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical or other installations, are its component parts.
Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached.
An analysis of the application of this code article is found in the case of Equibank v. United States, Internal Revenue Service, 749 F.2d 1176 (5th Cir.1985). In Equibank, the plaintiff held a second mortgage on a New Orleans mansion. Foreclosure proceedings were filed on the first and second mortgages. The I.R.S. filed a federal tax lien and seized the residence when the owners failed to pay their income taxes. The first and second mortgages on the property primed the I.R.S. lien. With the consent of the owners, the I.R.S. took physical possession of the residence and removed several valuable antique crystal chandeliers. The plaintiff filed a petition for an injunction seeking the return of the chandeliers on the ground that they were component parts of the immovable, and were subject to the mortgages on the property. In order to remove the chandeliers, it was necessary to disconnect the internal house wiring from the wiring of the chandeliers and other fixtures. After the chandeliers were removed, the workboxes containing the internal house wiring were exposed along with the holes made by the securing connectors. The court noted that the removal of the chandeliers had to be done with persons having sufficient knowledge of electricity and electrical wiring to disconnect the wires without risking injury. The court also stated that this type of removal is not comparable to the simple unplugging of a lamp or other electrical appliance from a wall receptacle. Relying on the Expose'des Motifs of the 1978 revision of Book 2 of the Louisiana Civil Code, the Fifth Circuit Court discussed what it considered to be the proper interpretation of "electrical or other installations" in Article 466. The federal court distinguished electrical appliances which could be disconnected by pulling a plug out of a receptacle, such as lamps, toasters, mixers, radios, televisions, record players, etc., and other electrical installations which are "permanently" connected to the interior wiring of the structure, and which cannot be connected without certain knowledge of electricity and electrical wiring. Items in the latter category include built-in stoves or ovens, wall and ceiling electric heaters, central heating and air conditioning, electrical hot water heaters, overhead fans and similar electrical installations. The court considered that the determination of what items compose parts of a residence and not movable was based on the "societal expectations" of reasonable persons. In this regard, the court stated:
The ordinary view of society being a relevant consideration, we conclude our consideration by asking the near-rhetorical question: Does the average, ordinary, prudent person buying a home expect the light fixtures to be there when he or she arrives to take possession? Does that person expect the room to become illuminated when the light switch is thrown or should that person reasonably expect no response to the switch and, upon looking up, reasonably expect to see only a hole in the ceiling with the interior house wiring sticking out of the electrical workbox? In our view, the societal expectation is to have the lights go on. 749 F.2d at 1180.
*1055 As to the liability of Shel-Boze, in the instant matter, we find that the Equibank case is directly on point. The testimony of Hugh Shelton, President of Shel-Boze, establishes the fact that all fixtures removed by him were wired-in as opposed to things one plugs in, such as a floor lamp, or other movable electrical appliances.
The Equibank case may also be applied by analogy, to include the carpeting which was installed, and then subsequently removed by Jenkins Tile. Undoubtedly, a reasonable person buying a residence expects finished flooring to be there when he or she takes possession. The societal expectation is to have finished flooring, such as carpeting.
The testimony of William J. Jenkins, President of Jenkins Tile Company, Inc., shows that the carpet was completely installed in the residences, and as far as the carpet installation was concerned, the houses were ready for occupancy.
A review of the evidence leads us to the conclusion that the light fixtures, other electrical paraphernalia and carpeting had become component parts of the two residences in question prior to their removal by Shel-Boze and Jenkins Tile, respectively.
We further find that the trial judge erred in his conclusion that the mortgages in favor of AmBank did not perfect, from the date of recordation of the mortgages, a security interest in the component parts of the two residences.
Applicable to the issue at hand are Louisiana Civil Code Articles 462, 463, 469 and La.R.S. 9:2721, which provide as follows:
Article 462: Tracts of land, with their component parts, are immovables.
Article 463: Buildings, other constructions permanently attached to the ground, standing timber, and unharvested crops or ungathered fruits of trees, are component parts of a tract of land when they belong to the owner of the ground.
Article 469: The transfer or encumbrance of an immovable includes its component parts.
La.R.S. 9:2721: No sale, contract, counter letter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease or other instrument or writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated; and neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties.
By reading Articles 462, 463 and 469 in pari materia, it is clear that residences, such as the ones at issue, built on concrete slabs, are classified as immovables. Moreover, according to Article 469, an encumbrance of an immovable, such as a mortgage on a building, includes the encumbrance of its component parts.
In order to finance the construction of the property in question, the owner-contractor entered into two separate collateral mortgage agreements with AmBank. The mortgages provided for a security interest in the two lots, together with all the buildings and improvements thereon. All of the necessary exhibits to establish the indebtedness of the owner of the property to AmBank were introduced at trial, as well as all exhibits and testimony necessary to perfect AmBank's mortgage. In applying Civil Code Article 469 to these facts, we conclude that the mortgages also encumbered the component parts of the two residences. Additionally, according to La.R.S. 9:2721, the security interest in the component parts of the two residences, perfected by the mortgage agreements entered into between the owner and AmBank, became effective as to third parties from the time the mortgages were filed for recordation in the office of the recorder of mortgages in East Baton Rouge Parish. Certified copies of the mortgages were introduced into evidence. These documents establish that the date of recordation was May 7, 1985, which is a date before construction began.
We find that the trial judge was in error in holding that November 22, 1985, the date the foreclosure proceeding was *1056 filed by AmBank was the operative date when AmBank acquired a security interest in the property, including the electrical fixtures and carpet. This ruling fails to consider Articles 462, 463, 469 and La.R.S. 9:2721, and must be reversed. Mortgages rank from the date of their filing for recordation, not the date when a foreclosure is filed.
We further find that the trial judge erred in his failure to award a money judgment against the defendants for the cost of replacing the items which were removed from the residences by the defendants.
Just as the plaintiff in Equibank v. United States, supra., Ambank sued initially for injunctive relief herein. Later, believing that most, if not all, of the items removed from the property had been disposed of by the defendants, AmBank amended its petition to seek a money judgment against the defendants for the value of the fixtures removed, plus the cost of reinstallation.
The evidence presented at trial clearly establishes the measure of AmBank's damage. With respect to the carpet, W.E. Williams, Jr., an officer of AmBank, who for five years managed and dealt with all real estate owned by AmBank, testified that the removed carpet was replaced with carpet of a similar grade and in keeping with the general style and value of homes in the neighborhood. His testimony was supported by the testimony of Verien Flaherty of Lacour's Carpet World, who supplied and installed the replacement carpet. The new carpet cost AmBank $4,275.40.
With regard to the light and other electrical fixtures, Williams testified that the fixtures removed and the replacement fixtures were of similar quality and in keeping with the style and quality one would expect in a home in Riverbend Subdivision. This was corroborated by the testimony of John Stuart of Stuart Distributors, who supplied the replacement fixtures at a cost of $2,330.57. Included in these replacement fixtures were ceiling fans which were not in the houses previously. These ceiling fans cost approximately $500.00. Hence, the net cost of the replacement fixtures amounted to $1,830.57.
Williams hired Cal Hamilton to install the fixtures. He was paid $810.00 by AmBank to install the fixtures, including the ceiling fans. Hamilton testified that he would have charged $90.00 for installing the fans alone. Therefore, the net cost of installation was $720.00.
In summary, the damage claim proven by AmBank is as follows:

Carpet and installation $4,275.40
Electric fixtures 1,830.57
Electrical installation 720.00
 _________
Total $6,825.97

Ambank joined as defendants an individual officer of each corporate defendant in his individual capacity. We find that the evidence fails to establish personal liability of these individuals to AmBank for the sums demanded from their respective companies. Each of them operated at all times on behalf of his principal corporation. It is elementary that they are not individually liable for corporate obligations.
For the foregoing reasons, we reverse the judgment appealed in part and affirm in part, and render judgment in favor of American Bank & Trust Company, as follows:
1. Judgment against Shel-Boze, Inc. in the full sum of $2,550.57;
2. Judgment against Jenkins Tile Company Inc. in the full sum of $4,275.40.
We affirm the judgments of dismissal against Hugh Shelton and William Jenkins. Costs of the trial are to be paid one-third each by AmBank, Shel-Boze and Jenkins Tile. Costs of this appeal are to be borne one-half by AmBank, one-fourth by Shel-Boze and one-fourth by Jenkins Tile.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.