862 So.2d 358 (2003)
WILLIS-KNIGHTON MEDICAL CENTER, Plaintiff-Appellee,
v.
CADDO-SHREVEPORT SALES and Use Tax Commission, Defendants-Appellant.
No. 37,914-CA.
Court of Appeal of Louisiana, Second Circuit.
December 10, 2003.
Applications for Rehearing Denied January 22, 2004.
*360 Barham & Warner, L.L.C. by Richard G. Barham, Shreveport, for Appellant.
Oreck, Bradley, Crighton, Adams & Chase, by Jesse R. Adams, III, Andre B. Burvant, for Appellee.
Before BROWN, CARAWAY and MOORE, JJ.
MOORE, J.
The Caddo-Shreveport Sales and Use Tax Commission ("the Commission") appeals a judgment awarding a substantial refund to the plaintiff, Willis-Knighton Medical Center ("Willis-Knighton"), of sales and use taxes it paid on certain transactions. Willis-Knighton answers the appeal, contesting the denial of other refunds. Finding merit in both parties' positions, we reverse and render.

Procedural Background
Willis-Knighton operates a not-for-profit medical center with three hospitals in Shreveport. In December 1996, Willis-Knighton wrote the Commission to claim a credit for sales and use taxes it overpaid from December 1992 through September 1994; later, it also claimed a credit for overpayments from October 1994 through December 1996. Willis-Knighton claimed, in essence, that its purchases of food for resale to patients, medical devices, blood and blood products, and contract maintenance on immovable equipment, were either excluded or exempt from local sales and use taxes. In early January 1998, the Commission denied both requests for credits.
In mid-January 1998, when Willis-Knighton filed its monthly tax return, it advised the Commission that $47,221 was being paid under protest. Willis-Knighton filed the instant suit in late January 1998, demanding a refund of the sum paid under protest, pursuant to Combined Ordinance ("C.O.") § 11.01, providing for the refund of taxes paid under protest. It also demanded $568,984 for the alleged overpayments between December 1992 and December 1996, pursuant to C.O. §§ 11.02 and 11.04, providing for the full adjudication of any finding of the Commission. Willis-Knighton claimed that it owed no local sales and use taxes for the following[1]:
(1) Albumin and other blood products, allegedly exempt under statutes that define "human tissue transplant" to include "blood and blood products" that are placed in a recipient individual. La. R.S. 47:301(10)(d), 33:2717.
(2) Medical devices used by patients to treat diseases under the supervision of and prescribed by their treating physicians, allegedly exempt under R.S. 47:305 D(1)(s).
(3) Repairs and maintenance on Willis-Knighton's MRI, Starcam, X-rays and large sterilizers, on grounds that sales and use tax applies only to repairs of tangible personal property, R.S. 47:301(14)(g), while these items were permanently attached to the hospital *361 building and thus immovable under La. C.C. arts. 465, 466.
The Commission conceded that Willis-Knighton had been cooperative with its auditors, but vigorously denied every other aspect of the claims. The parties filed several motions for summary judgment, all of which were denied. The matter was finally set for trial in September 2002.
On the morning of trial, the Commission filed an exception of no right of action, urging that the only way a taxpayer can obtain a refund is by paying under protest, pursuant to C.O. § 11.01. The court took this under advisement. The parties announced that they had reached agreements with respect to all issues except the exempt status of the medical devices, blood and blood products; whether the nuclear cameras were immobilized; and whether Willis-Knighton waived its claim to any overpayments not made under protest. Three witnesses testified, and the Commission filed a post brief regarding the nuclear cameras.
In December 2002, the district court rendered a written ruling. It first overruled the Commission's exception of no right of action: "Section 10 of the Combined Ordinances provides a procedure for the refund of taxes paid without protest and in error when the claim is made within three years." On the merits, the court found that the nuclear cameras were permanently attached to the hospital, were "other installations" as contemplated by C.C. art. 466, and thus Willis-Knighton was entitled to a refund of local sales and use taxes on contract maintenance for them. Next it found that medical devices were specifically exempt from local sales and use tax under R.S. 47:305 D(1)(s), as enacted in 1985; the court rejected the Commission's argument that a 1991 amendment to subsection D(6), which generally lifted medical exemptions from local taxes, also removed the exemption for medical devices. Thus it found that Willis-Knighton was entitled to a refund of these taxes. Finally, the court found that tissue transplants are exempt from local sales and use tax only if they are "blood or blood products transplanted from one individual into another recipient individual." R.S. 33:2717. The court accepted testimony that currently most transfusions consist of blood products taken from multiple donors. The court therefore rejected this claim for refund.
The judgment ordered the Commission to refund overpayments of $6,724.93 for taxes on service to the nuclear cameras and $356,551.03 for taxes on medical devices for the period December 1992-December 1996, not paid under protest. The judgment also ordered a refund of $21,877.80 for taxes on service to the nuclear cameras and $6,850,617.23 for taxes on medical devices, all paid under protest since January 1998, together with any such taxes paid under protest since trial. All awards were subject to judicial interest. The judgment denied Willis-Knighton's claims totaling $135,590.11 for local taxes paid on blood and blood products.
The Commission appealed suspensively, urging the court erred in overruling the exception of no right of action, exempting the sales of medical devices, and finding that the nuclear cameras were component parts of the building. Willis-Knighton answered the appeal, urging the court should have found that blood products were excluded from local sales and use taxes.

Discussion: Exception of No Right of Action
By its first assignment the Commission urges the court should have sustained its exception of no right of action. It contends that as a general rule, if there is a question of fact or law, a taxpayer must pay the taxes under protest as a predicate *362 to filing suit. Kean's Partnership v. Parish of East Baton Rouge, 96-0751 (La.11/25/96), 685 So.2d 1043; Ingram Oil Co. v. St. John the Baptist Parish School Bd., 406 So.2d 784 (La.App. 4 Cir.1981), writ denied, 412 So.2d 87 (La.1982). Payment under protest is a specific requirement of C.O. § 11.01, and refund without payment under protest is available only when there is "no question of fact or law," C.O. § 10.04, a situation not present in this case.
Willis-Knighton concedes that § 11.01 establishes the procedure of paying under protest, but argues it is not the sole procedure to obtain relief from the Commission. It contends that §§ 10.02, 10.03 and 10.04 allow taxpayers to file claims for refund of taxes any time within three years of payment, without protest. It concedes that § 10.04 appears to limit this procedure to cases of "no question of fact or law," but urges this would lead to the "audacious position" that once the Commission decides to deny a refund request, the taxpayer is without remedy.
The taxpayer's remedy for grievances arising out of the tax ordinance is defined by C.O. § 11.01:
A right of action is hereby created to afford a remedy at law for any dealer aggrieved by the provisions of this ordinance; and in case of any such dealer resisting the payment of any amount found due, or the enforcement of any provisions of such laws in relation thereto, such dealer shall pay the amount found due by the Administrator and shall give the Administrator notice, at the time, of his intention to file suit for the recovery of the same; and upon receipt of such notice the amount so paid shall be segregated and held by the Administrator for a period of thirty (30) days; and if suit be filed within such time for recovery of such amount, such funds so segregated shall be further held, pending the outcome of such suit. If the dealer prevails, the Administrator shall refund the amount to the claimant, with interest at the rate of two percent (2%) per annum covering the period from the date the said funds were received by the Caddo-Shreveport Sales and Use Tax Commission to the date of refund.
This procedure, called "payment under protest," complies with due process requirements. Cat's Meow Inc. v. City of New Orleans, 98-0601 (La.10/20/98), 720 So.2d 1186; McKesson Corp. v. Division of Alcoholic Bev. & Tobacco, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990). Willis-Knighton plainly did not pay under protest from December 1992 through December 1996. Instead, it demanded a refund without protest. That procedure is defined by § 10.04:
Where no question of fact or law is involved, and it appears from the records of the Caddo-Shreveport Sales and Use Tax Commission that any monies have been erroneously or illegally collected from any dealer, or have been paid by any dealer under a mistake of fact or law, the Administrator may, at any time within three (3) years of payment, upon making a record in writing of his reasons therefor, certify that any dealer is entitled to such refund and thereupon the Administrator shall authorize the payment thereof from any appropriation available for such purposes.
In Kean's Partnership v. Parish of East Baton Rouge, supra, the taxpayer advanced exactly the same argument as that now raised by Willis-Knighton, based on East Baton Rouge city-parish ordinances that are the equivalent of C.O. *363 §§ 10.04 and 11.01.[2] By a plain reading of § 10.04's analog, the supreme court found that "when no question of fact or law exists and the taxes have been paid under a mistake of fact or law," then the director shall authorize a refund. However, if questions of fact or law exist, then the director has the discretion to grant or deny a refund. Unlike the remedy for payment under protest, there is no judicial recourse for review of the Administrator's decision when payment is made without protest. The court elaborated:
[W]hen a taxpayer voluntarily pays the sales tax (not under protest) and then files a claim for a refund with the Director, and if the Director determines that no refund was owed because there was a genuine issue of fact or law, then the only relief the taxpayer is afforded is judicial review of the Director's determination that there existed a genuine legal or factual controversy over whether the taxes were owed. If we were to decide that judicial review is available to the taxpayer regardless of the existence of a question of fact or law, the payment under protest requirements in local ordinances would be rendered meaningless and the local governing authorities would be subject to claims for refunds without having segregated the funds therefor. Reading Section 14(a) [cf. C.O. § 11.01] and Section 26 [cf. C.O. § 10.04] in pari materia, we conclude that judicial review of a tax issue is guaranteed only when the taxpayer avails himself of the payment under protest procedure or where "no question of fact or law is involved."
685 So.2d at 1046 (emphasis added).
This analysis completely answers Willis-Knighton's contentions. While § 10.04 does establish a procedure for refund without protest, that procedure is available only in the absence of questions of fact or law, and when the payments have been erroneous. The Commissioner found valid issues of fact and law regarding the medical devices, the nuclear cameras and blood products. This finding is not plainly wrong, so Willis-Knighton has no further judicial review of the decision not to refund taxes paid without protest. The district court committed legal error in finding otherwise.
The full legal remedy under § 11.01 hinges upon giving notice at the time of payment, something Willis-Knighton did not do until January 1998. Ingram Oil Co. v. St. John the Baptist Parish School Bd., supra. This foreclosed its right to assert legal and factual issues with respect to taxes paid without protest. The district court erred in overruling the exception of no right of action. The judgment is reversed insofar as it ordered the refund of any taxes paid without protest.

Nuclear Cameras as Component Parts
By its third assignment the Commission urges the district court erred in finding that the GE Medical and ADAC Laboratories nuclear cameras were "other installations" as defined by La. C.C. art. 466, and thus as a matter of law component parts of the hospital building. Citing the first and second paragraphs of art. 466, the Commission urges that a nuclear camera is neither the type of accessory that is legally presumed to be a component part, nor factually a component part because it is not permanently attached to the hospital. Showboat Star Partnership v. Slaughter, XXXX-XXXX (La.4/3/01), 789 So.2d 554; Hyman v. Ross, 26,096 (La.App. 2 Cir. *364 9/21/94), 643 So.2d 256. The Commission specifically argues that removing the camera would cause no substantial damage either to the camera or to the building. It also contends the camera fails to satisfy the second paragraph of art. 466 because there is no societal expectation of finding a nuclear camera in a large commercial building. Showboat Star, supra; Coulter v. Texaco Inc., 117 F.3d 909 (5 Cir.1997).
Willis-Knighton contends that the nuclear cameras are both "other installations" and permanently attached to the hospital building, thus meeting either test of art. 466. Equibank v. United States, 749 F.2d 1176 (5 Cir.1985); American Bank & Tr. Co. v. Shel-Boze Inc., 527 So.2d 1052 (La. App. 1 Cir.), writ denied, 532 So.2d 155 (La.1988). Willis-Knighton also cites a Louisiana Department of Revenue ruling that nuclear cameras, like MRI scanners, meet the "other installations" test. Revenue Ruling 02-003 (3/11/02). It also cites a 1999 Board of Tax Appeals judgment finding that its nuclear cameras are "other installations" and reversing an assessment of state sales and use tax for maintenance contracts. Willis-Knighton concludes that the district court's findings were not plainly wrong.
Sales of services include the furnishing of repairs to tangible personal property. La. R.S. 47:301(14)(g)(i). To determine whether a thing is a component part of an immovable and thus not subject to sales and use tax courts look to C.C. art. 466:

Art. 466. Component parts of building or other structures
Things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical or other installations, are its component parts.
Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached.
This court has held that the two paragraphs of art. 466 are separate and distinct and should be applied independently to determine whether a particular object is a component part. Hyman v. Ross, supra. The first paragraph declares that the enumerated installations are deemed to be permanently attached as a matter of law, without regard to the test of the second paragraph. The enumeration is merely illustrative; one commentator has noted, "a steam heating system, a hot water heater, a safe, doors, and a butane gas system may be component parts of a building under the first paragraph of art. 466." 2 A.N. Yiannopoulos, Property, § 142 (4th ed.2001). The second paragraph of art. 466 determines what constitutes permanent attachment with respect to things not covered by the first paragraph. It declares that things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable. Id.
In addition to the two-step analysis of art. 466, the jurisprudence has applied a "societal expectations" test to determine whether various items not enumerated in the first paragraph should nevertheless be deemed permanently attached as though they were specifically enumerated. In Equibank v. United States, supra, the issue was whether antique chandeliers were component parts of a house. The court of appeals stated:
The ordinary view of society being a relevant consideration, we conclude our consideration by asking the near-rhetorical question: Does the average, ordinary, prudent person buying a home expect the light fixtures to be there *365 when he or she arrives to take possession? Does that person expect the room to become illuminated when the light switch is thrown or should that person reasonably expect no response to the switch and, upon looking up, reasonably expect to see only a hole in the ceiling with the interior house wiring sticking out of the electrical workbox? In our view, the societal expectation is to have the lights go on.
Equibank, 749 F.2d at 1180. Notably, chandeliers and other light fixtures may be easily understood as electrical installations which satisfy the first paragraph of art. 466.
In the instant case, nuclear cameras are neither enumerated in the first paragraph of art. 466 nor deemed to be permanently attached under the second paragraph; thus the court must apply the societal expectations test.[3] The supreme court recently demonstrated this test's proper application in Showboat Star Partnership v. Slaughter, supra. In that case the operators of a gaming vessel filed suit for a refund of sales and use taxes paid under protest for purchases of gaming equipment (slot machines, roulette tables, cabinets, currency conveyor systems, surveillance systems and illuminated In signs). All these items were installed on the vessel during its construction. The gaming vessel operators contended that gaming equipment, like the antique chandeliers in Equibank, "is something one would reasonably expect to see when they enter a gaming riverboat."
The supreme court disagreed, noting that the "relevant inquiry is not whether society expects to see gaming equipment when it enters a riverboat operated for gaming purposes, but whether society expects to see such equipment when itenters a vessel." Id., at 559 (emphasis in original). The court concluded that society holds no such an expectation. The court also cited the analogous field of offshore oil exploration, in which a reasonable business entity buying an offshore drilling platform would not expect, in the absence of specific contractual provisions, a heavy and extremely expensive drilling rig to be a component part thereof. Coulter v. Texaco, supra.
Synthesizing the supreme court's approach in Showboat Star and the Fifth Circuit's approach in Coulter, supra, we conclude the district court erred in finding that society expects a hospital to contain nuclear cameras. The proper analysis under Showboat Star and Coulter is whether a commercial building must contain a nuclear camera to meet societal expectations. This obviously is not the case. The district court committed legal error in finding that the nuclear cameras were component parts of the hospital buildings under the first paragraph of art. 466.
The district court further observed that it "may be unnecessary to apply the second paragraph of art. 466," but found that the nuclear cameras are "mounted and anchored in concrete and hardwired into the hospital's electrical supply," cannot move around, require a special foundation, and cannot be removed without exposing the concrete foundation. We have closely reviewed the testimony of Willis-Knighton's director of clinical engineering, Mr. Wesley Smith. He testified that the cameras require a special foundation to assure they are level, and that because of their sensitivity they should not be moved. However, he also testified that the cameras *366 are not intended to be permanent fixtures: they will be removed when they become obsolete and replaced with more modern equipment. He explained that when one is removed, the process damages neither the camera nor the building. This negates any showing, under the second paragraph of art. 466, that removing the camera would substantially damage both the camera and the building.
On this evidence, the district court was plainly wrong to find the nuclear cameras were permanently attached to the building. We therefore attach no weight to the administrative construction of art. 466 in Revenue Ruling 02-003. Contemporaneous construction of a statute cannot have weight when it is contrary to or inconsistent with the statute. Sales Tax Dist. No. 1 v. Express Boat Co., 500 So.2d 364 (La. 1987); Board of Trustees v. St. Landry Parish Bd., XXXX-XXXX (La.App. 1 Cir. 2/14/03), 844 So.2d 90, writ denied, XXXX-XXXX (La.5/9/03), 843 So.2d 404. For the same reason, the ruling of the Board of Tax Appeals, another executive agency, La. R.S. 36:4 B(1)(p), with regard to state sales and use tax, is not persuasive.
The portion of the judgment ordering a refund of local sales and use taxes for the maintenance contracts covering the nuclear cameras will be reversed.

Exemption of Medical Devices from Local Taxation
By its second assignment the Commission urges the district court erred in granting Willis-Knighton an exemption to local sales and use taxes on medical devices. The Commission contends that the applicable statute, R.S. 47:305 D(1)(s), creates an exemption only from the sales and use tax levied by the state. A tax exemption (as distinguished from an exclusion) is strictly construed against the taxpayer. McNamara v. Central Marine Serv., 507 So.2d 207 (La.1987). The medical device exemption was created in 1985, at which time state-tax exemptions applied to local taxes unless "otherwise specifically provided." R.S. 47:305 D(6). However, in 1991 the presumption was reversed; now, any exemption must "specifically provide in the title and body of the bill that it is applicable to a political subdivision." The Commission urges that the 1985 act creating the medical device exemption failed to do this, and that the 1991 amendment "threw into doubt" all exemptions passed between 1978 and 1991. The Commission refers to similar statutes, R.S. 33:2716.1 and 47:302 E, which clearly show a legislative intent to deny the exemption for local taxes unless the enabling act clearly so provides. The Commission relies on Tenet Healthsystems Hosp. v. Parish of St. Tammany, XXXX-XXXX (La.App. 1 Cir. 6/23/00), 762 So.2d 1144, writ denied, 2000-2518 (La.11/27/00), 775 So.2d 448, as following this line of reasoning and disallowing a local tax exemption for medical devices.
Willis-Knighton contends that Winn Parish School Bd. v. PO2 Inc., 29,089 (La. App. 2 Cir. 2/26/97), 690 So.2d 911, holds that the medical device exemption applies to local taxes, as does a plain reading of R.S. 47:305 D. It asserts that the 1991 amendment to D(6), while reversing the presumption prospectively, left open the validity of prior exemptions (it begins, "Without determining the validity of any exemptions placed in this subsection subsequent to the effective date of Act 205 of 1978"). Willis-Knighton traces the history of R.S. 47:305 to show that the legislature has not limited the application of the medical devices exemption, as it has with several other exemptions. Finally, Willis-Knighton argues that exemptions must be uniform between the state and local authorities, La. Const. art. 6 § 29(D); the legislature lacked authority to exempt medical devices from state sales and use *367 tax but not from local tax. In support it cites BP Oil Co. v. Plaquemines Parish Gov't, 93-1109 (La.9/6/94), 651 So.2d 1322.
A tax exemption is an exceptional privilege which must be expressly and clearly conveyed in plain terms. Showboat Star Partnership v. Slaughter, supra; Bill Roberts Inc. v. McNamara, 539 So.2d 1226 (La.1989). Tax exemptions are strictly construed against the taxpayer claiming the benefit thereof and must be clearly, unequivocally and affirmatively established by the taxpayer. Archer Daniels Midland Co. v. Parish School Bd. of St. Charles, XXXX-XXXX (La.11/28/01), 802 So.2d 1270; McNamara v. Central Marine Serv., supra.
The medical device exemption is as follows:
§ 305. Exclusions and exemption from the tax
D. (1) The sale at retail, the use, the consumption, the distribution, and the storage to be used or consumed in this state of the following tangible personal property is hereby specifically exempted from the tax imposed by this Chapter [sales tax collected and administered by the state collector of revenue]:
* * *
(s) Any and all medical devices used exclusively by the patient in the medical treatment of various diseases or administered exclusively to the patient by a physician, nurse, or other health care professional or health care facility in the medical treatment of various diseases under the supervision of and prescribed by a licensed physician.
When the legislature added this exemption by La. Acts 1985, No. 901, the statute further provided:
(6) The exemptions from the State sales and use tax provided in this subsection shall be applicable to any sales and use tax levied by any local governmental subdivision or school board except as otherwise provided in this subsection.
In 1991, however, the legislature amended Subsection D(6) to provide as follows:
(6) The exemptions from the state sales and use tax provided in this Subsection in existence as of the effective date of Act 205 of 1978 shall be applicable to any sales and use tax levied by any local governmental subdivision or school board except as otherwise specifically provided in this subsection. Without determining the validity of any exemptions placed in this Subsection subsequent to the effective date of Act 205 of 1978, all Acts after the 1991 Regular Session placing an exemption in this Subsection which is applicable to a political subdivision must, to be effective, specifically provide in the title and body of the bill that it is applicable to a political subdivision. * * *[4]
The medical device exemption was not in existence as of the effective date of Act 205 of 1978, and it was not placed in the Subsection after the 1991 regular session. The issue is whether it applies to local sales and use taxes paid under protest beginning in January 1998.
In Tenet Healthsystems Hosp. v. Parish of St. Tammany, supra, the court addressed precisely this issue. After laying out the statutory background, the court reasoned:
Under La. R.S. 47:305 D(6) after its amendment by Act 1065, the exemptions *368 set forth in Section 305 D in existence as of June 29, 1978, the effective date of Act 205 of 1978, applied to any sales and use tax levied by any local taxing authority unless otherwise specifically provided therein. The medical device exemption created by Act 901 of 1985 was not one of those in existence as of June 29, 1978. Therefore, by virtue of La. R.S. 47:305 D(6), the medical device exemption does not apply to any sales and use tax levied by any local taxing authority.
This conclusion, in our view, is supported by a plain reading of R.S. 47:305 D(1)(s) and D(6). Although the 1991 amendment officially skirted the validity of exemptions placed in the statute between 1978 and 1991, the plain effect was to remove any exemption from local sales and use tax unless it clearly applied to local tax. Subsection D(1)(s) clearly does not.
The Tenet court also noted that when the legislature created the medical device exemption in 1985, other statutes clearly indicated that it would not apply to local sales and use tax. A section of Title 33, affecting the taxation and fiscal affairs of municipalities and parishes," was amended in 1978 to provide:
§ 2716.1. Prohibited exemptions; specific application required
* * *
(B) No exemption from the state sales and use tax granted subsequent to the effective date of this Act and granted pursuant to the provisions of Chapters 2 or 2-A of Title 47 of the Louisiana Revised Statutes of 1950 [including R.S. 47:305] shall be applicable to any sales and use tax levied by any local governmental subdivision or school board unless the state exemption specifically provides that it applies to such sales and use tax levies. In the absence of any such specific application of the state exemption to sales and use tax levies of any local governmental subdivision or school board, any state exemption granted after the effective date of this Act and granted pursuant to the provisions of Chapters 2 or 2-A of Title 47 of the Louisiana Revised Statutes of 1950 shall be applicable only to the levy and collection of the state sales and use tax.[5]
R.S. 47:302 E, amended by the same 1978 act as the preceding statute, similarly made exemptions to state sales and use tax inapplicable to local sales and use tax unless the opposite is clearly expressed:
E. No exemption from the state sales and use tax granted after the effective date of this Act and granted pursuant to the provisions of this Chapter or Chapter 2-A of Title 47 of the Louisiana Revised Statutes of 1950 [including R.S. 47:305] shall be applicable to any sales and use tax levied by any local governmental subdivision or school board unless the state exemption specifically provides that it applies to such sales and use tax levies. In the absence of any such specific application of the state exemption to sales and use tax levies of any local governmental subdivision or school board, any state exemption granted pursuant to the provisions of this Chapter or Chapter 2-A of Title 47 of the Louisiana Revised Statutes of 1950 shall be applicable only to the levy and collection of the state sales and use tax.
These two statutes were both in effect when the legislature added the medical device exemption from state sales and use tax in 1985. From that time until Willis-Knighton lodged the instant protest, no *369 legislation has provided that the exemption set forth in 47:305 D(1)(s) applied to local sales and use tax.
Willis-Knighton vigorously urges that BP Oil Co. v. Plaquemines Parish Gov't, supra, mandates a finding that the medical device exemption must apply to local sales and use taxes. The court in Tenet, however, noted that the dispute in BP Oil involved local sales and use tax payments made between January 1985 and October 1990i.e., prior to the 1991 amendment of 47:305 D(6), which reversed the presumption. For this reason, the precise holding of BP Oil is distinguished.
Willis-Knighton further argues that between 1973 and 1978, the legislature enacted a series of health care exemptions, each time specifically designating that it would not apply to local sales and use taxes.[6] With the enactment of the medical device exemption in 1985, however, there was no statement limiting the exemption to state tax. Willis-Knighton contends that this sequence of events proves a legislative intent to make Subsection D(1)(s) apply both to state and local taxes. For the reasons expressed, however, we find that a plain reading of 47:305 mandates the opposite conclusion; we therefore will not resort to the inferences provided by legislative history. La. C.C. art. 9; Cacamo v. Liberty Mutual Fire Ins. Co., 99-3479 (La.6/30/00), 764 So.2d 41; Southwest Gaming Servs. of La. v. Caddo-Shreveport Sales & Use Tax Comm'n, 27,335 (La.App. 2 Cir. 9/27/95), 661 So.2d 662, writs denied, 95-2546, 95-2578 (La.1/5/96), 666 So.2d 294 (concurring opinion).
Finally, Willis-Knighton urges that this court's opinion in Winn Parish School Bd. v. PO2 Inc., supra, declares medical devices exempt from local taxation. In that case, PO2 had sold "numerous medical items" in Winn Parish; it claimed exemptions from local sales and use tax under 47:305 D(1)(s). The school board filed suit to recover those taxes. PO2 obtained a partial summary judgment which held, in effect, that most of the items were medical devices rather than patient aids, and that the medical device exemption applied to local sales and use tax. By contrast, sales of "patient aids" are plainly not exempt from local tax. R.S. 47:305 D(4). The school board appealed, and this court found genuine issues of material fact as to whether most of the items were patient aids, not medical devices. We therefore remanded the case for further proceedings.
The only issue raised in PO2 was whether certain medical itemsportable oxygen bottles, patient lifts, trapeze bars, wheelchairs, bedside commodes, and others were more nearly "patient aids" than "medical devices." Because of the genuine issues of material fact, we did not address whether the medical device exemption of R.S. 47:305 D(1)(s) applied, as a matter of law, to local sales and use tax. We therefore reject Willis-Knighton's contention that PO2 mandates such a holding. For the reasons expressed herein, we subscribe to the rationale of Tenet Healthsystems Hosp. v. Parish of St. Tammany, supra.
The portion of the judgment ordering a refund of local sales and use taxes for the sale of medical devices will be reversed.

Exemption of Blood Products
By answer to appeal, Willis-Knighton urges that the blood products at issue are excluded from local sales and use taxes. It concedes that La. R.S. 33:2717 and 47:301(10)(d), governing local and state *370 taxation respectively, require transplantation "from one individual into another recipient individual," but argues they do not require direct transplantation. Willis-Knighton contends that the district court's interpretation would virtually nullify the blood products exemption because most blood centers blend the components of many donors to yield enough product for one recipient.
The Commission urges that the local tax statute, R.S. 33:2717, creates only an exemption, not an exclusion, and that a plain reading cannot negate its requirement of "from one individual." The Commission also suggests that by collecting blood components from a pool of people, blood centers create a "more useful product," and a rational basis exists for treating sales of concentrated blood components differently from whole-organ transplants.
For the time frame involved in this case, human tissue transplants were exempt from local sales and use tax:
§ 2717. Exemptions; human tissue transplants
The sale of any human tissue transplant shall be exempt from the sales and use tax levied by any political subdivision of the state. For purposes of this exemption, human tissue transplants shall include all human organs, bone, skin, cornea, or blood or blood products transplanted from one individual into another recipient individual.[7]
Similarly, for purpose of state sales and use tax, "sale at retail" excludes "blood, or blood products transplanted from one individual into another recipient individual." R.S. 47:301(10)(d).
The parties have not cited, and we are unaware of, any jurisprudence addressing the sales of blood products such as those at issue here. We recognize the principle of strict construction of tax exemptions. Archer Daniels Midland Co. v. Parish School Bd. of St. Charles, supra; McNamara v. Central Marine Serv., supra. We are also guided by the rule that when the words of a law are ambiguous, "their meaning must be sought by examining the context in which they occur and the text of the law as a whole." La. C.C. art. 12. In the analogous context of interpreting a contract, a provision susceptible of different meanings "must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. C.C. art. 2049.
Dr. Kenneth Harrison, an anatomical and clinical pathologist, testified hospitals rarely transfuse whole blood from one donor into one recipient. He referred to 17 components extracted from whole blood and pooled for transfusion. He explained that only red cells and plasma are plentiful enough in any one donor to benefit a recipient by direct transfusion; it would be wasteful to transfuse whole blood to a patient who needed only albumin, a protein component. He added that 50 to 100 donors are often needed to contribute enough of whole blood to make one usable unit of albumin. The Commission offered no evidence to contradict Dr. Harrison's assessment of blood industry practices.
This evidence convinces us that as a matter of general understanding, "blood products" encompass blood components extracted from multiple donors and combined to make a usable dosage of the given product. This definition, however, is inconsistent with R.S. 33:2717's limitation, "from one individual." Because of this ambiguity, we must look to the law as a whole. The purpose of R.S. 33:2717 was to exempt from local sales and use taxes certain transplants, including blood and blood products. To apply the exemption solely to one-to-one transplants would defeat the obvious purpose of the law. We therefore *371 find the district court was legally and manifestly erroneous to deny this exemption.
The portion of the judgment denying a refund of taxes paid under protest for the sale of blood and blood products will be reversed. Judgment will be rendered in favor of Willis-Knighton for a refund of local sales and use tax paid under protest on blood and blood products through the time of trial, $99,347.90, for any such taxes paid under protest after trial, and judicial interest from the date those taxes were paid.

Conclusion
For the reasons expressed, we reverse the judgment insofar as it denied the Commission's exception of no right of action, and ordered refunds of local sales and use taxes paid by Willis-Knighton for repairs and maintenance to its nuclear cameras and for sales of medical devices. We also reverse the judgment insofar as it denied the refund of local sales and use taxes paid under protest by Willis-Knighton for sales of blood and blood products. Judgment is hereby rendered in favor of Willis-Knighton and against the Commission in the amount of $99,347.90, representing taxes paid on blood and blood products under protest through the time of trial; for any such taxes paid since the time of trial; and for judicial interest from the date those taxes were paid.
Costs of appeal are assessed one-half to Willis-Knighton. The other half is not assessed. La. R.S. 13:4521.
REVERSED AND RENDERED.

APPLICATIONS FOR REHEARING
Before BROWN, STEWART, GASKINS, CARAWAY, and MOORE, JJ.
Rehearing denied.
NOTES
[1] Willis-Knighton also sought a refund of taxes paid on purchases of food for patients' meals and for Title 19 drugs, but these items are not issues on appeal.
[2] Unlike C.O. § 10.04, the East Baton Rouge ordinance required the Director to issue a refund upon a finding of no question of fact or law and that the payment had been made in error. Under § 10.04, the refund appears to be discretionary with the Commissioner.
[3] The district court utilized the "societal expectations" test as a component of the second paragraph of art. 466. R.p. 300.
[4] The legislature amended Subsection D(1)(s) by 2003 La. Acts, No. 73, § 1. Effective July 1, 2003, the medical device exemption is designated as "solely for purposes of the state sales and use tax."
[5] This statute was repealed by 2003 La. Acts No. 73, effective July 1, 2003. The concept was incorporated into the individual exemptions listed in 47:305 D(1).
[6] La. R.S. 47:305 D(4) was amended in 1973 to exempt drugs, wheelchairs and prosthetic devices; in 1974 to exempt patient aids; and in 1978 to exempt ostomy, ileostomy and colostomy devices.
[7] R.S. 33:2717 was repealed by 2003 La. Acts, No. 73, § 2, effective July 1, 2003.